Fuchsberg, J.
(dissenting). As were three of the members of the commission, I am of the opinion that the imposition of discipline, even the one lowest in the scale of sanctions, is not warranted in the circumstances of this case.
I accept the proposition that a Judge’s appointment of a person who enjoys a filial relationship with a second Judge, particularly where the two Judges are members of the same court,* may be perceived as creating an appearance of impropriety. Nor do I doubt that the same proposition may apply when, though innocently intended, appointments made by both Judges have produced a crossover situation. And, of course, I approve the commission’s enforcement of such a standard where appropriate.
In my view it is not appropriate to do so here. The system governing the selection of referees, guardians ad litem, and *471 other ad hoc functionaries essential to the conduct of court business for a long time was one subject to the personal preferences of the appointing Judges. There was no secret about this modus operandi. No canon or rule specifically assigned any impropriety or appearance of impropriety to it. To apply a current perception of impropriety retrospectively as the basis for the finding that acts that were once regarded as proper when performed are now to be classified as improper is fundamentally wrong. To do so exacts from the petitioner expiation for the legal community’s failure to have articulated and imposed a clearer standard in the past.
Before amplifying my views, a few words about the petitioner are in order. Justice Spector reached the extended retirement age of 76 in 1978. He had then completed 38 years of continuous and unblemished public service, the last 22 as a member of the judiciary with the final 6 the result of three two-year appointments, the maximum granted to Judges where there is a felt need for their continued services after they have reached the regular retirement age of 70. Even when, in mid-December, on the very eve of his departure from office, the commission issued its public recommendation that he be admonished, it raised no question concerning the integrity or competence with which he functioned in his public career.
The operative facts pertaining to the commission’s charge are simple. They were fully developed and ultimately presented to us in extensive hearings conducted by the commission and its able and conscientious counsel. And, since Justice Spector gave the inquiry his full co-operation, they are not in dispute. They involve the inclusion of two lawyer-sons of fellow Justices among the thousands of appointments the Justice routinely was called upon to make in the course of facilitating the processing of cases. One of the appointees was chosen on only two occasions over a three and a half year period almost a decade ago. The other averaged about two appointments a year over a five and a half year span. None of these assignments was of major import. All were made , publicly. Each fulfilled his responsibilities completely. It is not suggested that any conflict of interest was involved in any way. The appointees received only the modest fees customarily allowed in such cases; in some instances, no charge was made at all.
During the years in which the two appointees undertook *472 these assignments, the petitioner’s son, also a lawyer and indisputably qualified, was called upon to discharge similar tasks for the other Justices on a very limited number of occasions. The appointments did not correspond with those made by Justice Spector, nor was there any evidence that there had been either a matching of fees or any attempt at reciprocation. As a result, there is no contention that one was a quid pro quo for the other. To the contrary, petitioner testified without any contradiction that his long personal and professional acquaintance with the appointees and their families provided him with an unusually reliable basis for personally judging their suitability for the appointments.
Nevertheless, the commission concluded that the choice of the two appointees runs counter to a broadly worded judicial canon adopted administratively in New York at about the end of the period during which these appointments had issued. The canon enjoins Judges to avoid the appearance of impropriety. However, the commission points to no canon of ethics or other rule of judicial conduct which up to now interdicted the appointment of relatives of other sitting Judges, none automatically disqualifying such individuals from being considered for appointments, and none advising that such selections would give rise to an appearance of impropriety. Rather, at the argument of this appeal, the commission’s counsel candidly conceded there were none.
The "appearance of impropriety” concept is beset by legal and moral complexity. The concern is with what can be a very subjective and often faulty public perception. It is significant that the official reporter’s notes, after characterizing the canon on appearance of impropriety as virtually "hortatory”, illustrates its commentary solely with a discussion of problems involving "influence peddling”, obviously a form of conduct in which "appearance” is often an integral part of the substantive evil; under ejusdem generis principles, this is hardly an indication that the section is to be freely applied, and even less that it is to be extrapolated to circumstances akin to those present here (see Thode, Reporter’s Notes to Code of Judicial Conduct, p 49). It would appear to follow that, absent an accompanying substantive breach, a mere appearance of impropriety should not automatically merit condemnation.
We need look no further than to two of the qualities we demand of our Judges — courage and independence — to see how ready jurists must be, if the need arises, to brook "public *473 clamor, or fear of criticism” (Code of Judicial Conduct, Canon 3, subd A, par [1]). Yet, the appearance provision’s general "caution against unidentified wrongs” (McKay, The Judiciary and Nonjudicial Activities, 35 Law & Contemp Prob 9, 14) has led respected authority to conclude that it is so "troublesomely vague as a guide to conduct” that "it comes close to being an appeal to conformity for conformity’s sake” (Frank, Disqualification of Judges: In Support of the Bayh Bill, 35 Law & Contemp Prob 43, 59-60). Since "appearances” are matters of perception rather than fact it is not difficult to appreciate the fear so expressed and the need to invoke the canon with great restraint.
Indeed, lack of specificity as to what conduct makes a Judge vulnerable to a charge of appearance of impropriety may bear serious due process implications. Leaving the rules expected to be observed unidentified is bound to burden our Judges with uncertainty as to whether what is acceptable today will be deemed aberrant tomorrow. Putting men and women who have to judge the rights of others under such undeserved stress tends to undermine their own sense of worth. Our legal system should treat those who preside over it with more regard (Fuller, The Morality of Law [rev ed, 1969], 26-29, 38-39).
The drawbacks inherent in the uncharted vagueness of the "appearance” canon were also remarked upon by former United States Supreme Court Justice Arthur Goldberg, who, after characterizing the canon as "unbelievably ambiguous”, warned that "to avoid the appearance of impropriety, it helps both the public and the judge to know the guidelines”. Echoing the sentiments of other leaders of the American legal community, including Professor Philip Kurland, and the late United States Supreme Court Justice Tom Clark, Justice Goldberg went on to say, "Our Judges are men, not gods, and like all of us, they can benefit greatly from having some ground rules against which to measure their conduct * * * particularly * * * in this area of avoiding even the appearance of impropriety” (Nonjudicial Activities of Supreme Court Justices: Hearings on S 1097 and S 2109 Before the Subcommittee on Separation of Powers of the Senate Comm on the Judiciary, 91st Cong, 1st Sess [1969], pp 159, 165, 175, 185).
Inflexible enforcement of a vague standard of conduct brings untoward results. Regard the nature of the criticized appointments which were the subject matter of this proceeding. They *474 did not go to the quality of justice the petitioner was dispensing. They were not part of the Judge’s decisional function at all. Rather, they were made incidental to an administrative chore that could as well, if court organization had provided for it, have been handled by a nonjudicial functionary operating on a management level pursuant to well-defined procedures. But that was not the pattern of court administration which prevailed throughout the State when the petitioner first came on the Bench, nor when he made the appointments in question, nor, for that matter, when he retired.
Furthermore, it is agreed that here there was no finding of nepotism, overt or concealed. Nor, tracking the canons, code and rules set out in the majority opinion, is there any question of the "probity and impartiality” or "character and fitness” of the Justice’s appointees. It is also not claimed that he permitted "his appointments to be controlled by others than himself’, that they were "unnecessary”, that he approved compensation "beyond the fair value of services rendered” or that he had "recommended” the appointment of his son "to another judge serving in the same court”. I respectfully suggest, therefore, that the history of nepotism from the Han dynasty to the present, while interesting and useful as background, does not go to the heart of the issue in this case. And the language quoted by the majority from Meinhard v Salmon is hardly apropos; the words there were spoken in a context in which, to paraphrase Cardozo rhetoric, a private interest actually collided with that of a fiduciary and not one in which it only appeared or was imagined to have done so (Cardozo, The Growth of the Law, Yale U Press, 96).
True, "new times and new manners may call for new standards and new rules” (Cardozo, The Nature of the Judicial Process [1921 ed], p 88), but with their adoption should come fair notice and an opportunity to accommodate to the change, not precipitous implementation of a heretofore uncharted standard in an unexpected context. So, when the seminal model for our State’s Code of Judicial Conduct was first approved by the American Bar Association in 1972, it was thought wise and fair to create a special committee to promote awareness of its existence (Martineau, Enforcement of the Code of Judicial Conduct, 1972 Utah L Rev 410, 417-418; see, also, Bray, The Problems of Sanctions, U of Chi Law School Conference on Judicial Ethics, Conference Series, No. 19 [1965], p 42). In contrast, to apply standards of today to *475 judge the conduct of yesterday is of a kind with ex post facto statutes (see, generally, Marks v United States, 430 US 188; Bouie v City of Columbia, 378 US 347).
Understandably, no Judge can respond with less than pride to the flattering proposition that more may be expected of Judges than of ordinary mortals. It would be regrettable in the extreme, however, if we were driven to prove this by stripping members of oúr judiciary of the right they share with all people to be judged fairly. And it would be unfortunate to mistake an unwillingness to accede to a denial of this right as a tolerance of judicial misconduct whenever it truly exists.
Finally, it seems to me that appearance alone, in the main because it is so vague and unmapped, should not be permitted to reach out in disregard of all other considerations. Appearance, of course, is of moment only as suspicion attaches to an act. We like to think that no longer is condemnation to be meted out on mere suspicion. But "When we deal with what the public thinks, we must be careful not to accept the view of the most cynical as the true voice of the public, lest we accept a lack of faith in our institutions as a categorical basis for restricting otherwise quite ethical conduct” (International Electronics Corp. v Flanzer, 527 F2d 1288, 1294 [2d Cir]).
For all these reasons, I would vote no sanction.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur in Per Curiam opinion; Judge Fuchsberg dissents and votes to reject the determined sanction and impose no sanction, in a separate opinion; Judge Meyer taking no part.
Determined sanction accepted, without costs.

 The Judicial Conference indicates there are well over 3,500 Judges in New York State ranging all the way from Judge of the Court of Appeals to Justice of a Town or Village Court. Many of these, in turn, serve in separate county or city subdivisions of our court system often hundreds of miles from each other. I do not deem it necessary, for the purposes of this case, to speculate as to whether the rule pronounced by the court today is to prohibit a judicial appointment of anyone with a filial relation to any other Judge in the State whatsoever or only to those within certain geographical, jurisdictional or administrative limits. For instance, must a Supreme Court Justice in Suffolk County refuse to appoint a lawyer because one of the latter’s parents is a local Justice in a town in Erie County? (See 22d Annual Report of the Administrative Board of the Judicial Conference.)